*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0027p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LARRY PAT SOUTER,

  *Petitioner-Appellant,*

  *v.*

KURT JONES, Warden,

  *Respondent-Appellee.*

No. 03-1528

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 02-00067—Gordon J. Quist, District Judge.

Argued: September 14, 2004

Decided and Filed: January 18, 2005

Before: MOORE and CLAY, Circuit Judges, HAYNES, District Judge.[*]

---

## COUNSEL

**ARGUED:** John A. Smietanka, Grandville, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** John A. Smietanka, Grandville, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant Larry Pat Souter ("Souter") appeals the district court's dismissal of his petition for a writ of habeas corpus. Souter, currently incarcerated in a Michigan correctional facility, was convicted in 1992 of the murder of Kristy Ringler. In 2002, Souter filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction. The district court granted the State of Michigan's motion for summary judgment, finding that the petition was barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1). We granted Souter a certificate of appealability on two issues: (1) whether his petition was timely filed within one year of his discovery of new evidence; and (2) whether he is entitled to equitable tolling because he is actually innocent of the crime for which he was convicted. Because we find that Souter has demonstrated a credible

---

[*] The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

1

claim of actual innocence, he is entitled to equitable tolling, and the district court's dismissal of his habeas petition is hereby **REVERSED**.

# I. BACKGROUND

On August 25, 1979, around 3:00 A.M., Kristy Ringler ("Ringler") was found unconscious, lying on highway M37 in Newaygo County, Michigan. She was lying with her arms by her side, across the roadway, perpendicular to vehicular traffic, with a small pool of blood beneath her head. She died later that morning. Dr. Steven C. Bauserman ("Dr. Bauserman"), a neuropathologist, performed an autopsy on Ringler and discovered a severe five-inch laceration on her forehead and a similar one on the right side of her head. He concluded that the lacerations were caused by two separate blows with a sharp-edged instrument, which caused injury to the brain resulting in death. Dr. Bauserman theorized that Ringler's death could have been either a homicide or the result of being hit by a car.

Souter was the last known person to see Ringler prior to her being discovered unconscious in the road. Ringler and Souter met and became friendly at a bar that evening. When the bar closed around 2:20 A.M., the two left with several others to continue the party at the home of Anna Mae Carpenter, which is located off of M37. Most of the people at the party were drinking heavily, including Souter, who was drinking Canadian Club whiskey out of a pint-sized bottle ("the bottle") that he had bought earlier in the evening. Souter told police that while everyone else was inside, he and Ringler went out into the front yard of the house where they became amorous. According to Souter, at some point Ringler stood up abruptly, stated she was going home and began walking northbound along M37.[1] Souter testified at trial that he followed her for approximately 20-25 feet trying to persuade her to come back to get a ride home, but then ultimately gave up and returned to the party. Joint Appendix ("J.A.") at 335 (Trial Tr.). Upon his return to the Carpenter house, he ran into three people leaving the party. One of the three, Marvin Carpenter, testified at trial that Souter did not appear to be sweating, breathing hard, or acting abnormally. J.A. at 229-30 (Trial Tr.). Moreover, there was no blood visible on Souter's clothing. J.A. at 230 (Trial Tr.).

At trial, two drivers testified that they traveled down M37 around 2:50 A.M. and did not see either Ringler walking down the road or her body in the roadway. J.A. at 235-36, 259 (Trial Tr.). Five minutes later, at approximately 2:55 A.M., two truckers driving southbound on M37 saw a car in the opposite lane blinking its lights and a woman waving her arms to draw attention to the body lying in the road. One of the truckers testified at trial that he was struck by how clean Ringler's clothes were and noted that her shirt was still tucked into her jeans. J.A. at 246 (Trial Tr.). Once word reached the party that Ringler had been hit, Souter and the rest of the partygoers made their way to the location of the body, approximately 900 feet from the Carpenter house. On his walk there, Souter discarded the bottle on the side of the road. At the scene, Deputy Sheriff John Sutton ("Sutton") interviewed Souter and after he finished his initial investigation of the incident, drove Souter back to his friend's house. Sutton testified at trial that Souter was significantly intoxicated and there was no blood on him. J.A. at 310 (Trial Tr.).

The following day, the police recovered the bottle from a ditch along M37 near the Carpenter house. Souter acknowledged that the bottle belonged to him, denied any wrongdoing in Ringler's death, and turned over the boots he was wearing that night to the police. The laboratory analysis of the bottle revealed a trace of blood on the label, which turned out to be type A — the same type as Ringler, Souter, and 43% of the American population. The presence of blood on the label could be explained by the fact that Souter had cut his finger earlier that night on a jagged door handle at the Carpenter house.[2] Otherwise, there was no blood

---

[1]Two witnesses testified at trial that it was not unusual for Ringler to leave without telling anyone and walk home. Joint Appendix ("J.A.") at 220, 257 (Trial Tr.).

[2]Souter testified that during the party he followed Ringler out onto the front porch, cut his hand on the broken door knob, and fell to the ground. J.A. at 333 (Trial Tr.). The broken door knob cut his hand at the base of his index finger. Trial Tr. Vol. IV at 7-8. Terri Plotts, one of the other guests at the party, testified that she saw Souter fall off the porch as he exited the house.

or hair on the bottle or on Souter's boots. The only other physical evidence recovered in the investigation was particles of glass found on Ringler's jeans and in the gauze bandages around her wounds. The state police crime laboratory analyzed the particles and found that they were inconsistent with automobile headlight glass. Furthermore, the particles were not brown in color like the bottle. Dr. Lawrence Simpson ("Dr. Simpson"), a forensic pathologist consulted by the police on the matter, stated his belief that Ringler's injuries were consistent with being struck by a car rather than a homicide. Based on the evidence the police collected at the time, the Newaygo County prosecutor declined to press charges against Souter or anyone else.

Despite Dr. Simpson's contrary opinion, Detective Charles Foster ("Foster"), the chief investigating officer, concluded that Ringler could not have been hit by a car because (i) her body appeared to be placed on the roadway; (ii) there was very little blood at the scene; and (iii) there was an absence of blood, debris, or other foreign material found on her clothes. Four years later, in 1983, Foster presented the case to Dr. Ronald Graeser ("Dr. Graeser"), the Newaygo County medical examiner, and suggested that the bottle might be the murder weapon. Reviewing the autopsy slides, Dr. Graeser agreed with Dr. Bauserman's analysis that the lacerations were caused by a sharp-edged instrument which cut the skin but did not fracture the skull. Dr. Graeser projected the autopsy slides to life-size scale onto a wall and compared the wounds with the bottle. Dr. Graeser concluded that the bottle matched the shape of the wounds and issued a report which stated that the injuries "may well have been inflicted by the 'Canadian Club pint Whiskey' bottle." J.A. at 148 (Med. Exam. Rep.). The report also indicated that Dr. Stephen Cohle ("Dr. Cohle"), a forensic pathologist, agreed with this opinion. The county prosecutor reviewed Dr. Graeser's report and the other evidence in the case but declined to bring charges against Souter in 1983.

No further investigation was done on the Ringler case until 1991, when a newly-elected sheriff, who committed his office to reviewing unsolved homicides, revived the effort to solve the case. Though sheriff's deputies re-interviewed many of the original witnesses, no new evidence was discovered. The old evidence was once again presented to Dr. Graeser, who this time wrote a stronger report which concluded that Ringler's injuries were caused by the bottle and that it was "virtually impossible" that a side mirror on a car could have caused the injuries. J.A. at 98 (Mich. Cir. Ct. Remand Op.). An arrest warrant was issued for Souter in November 1991, twelve years after Ringler's death. Other than Dr. Graeser's new report, the evidence presented at trial was the same as that which was collected in 1979. Dr. Graeser testified on behalf of the prosecution, along with Dr. Bauserman, who performed the autopsy, and Dr. Cohle, who testified as an expert witness. Critical to the prosecution's argument was the testimony of Dr. Graeser that the bottle had a very sharp edge in 1979, which "[i]f you would take your hand and rub it across it hard, you'd probably cut yourself. That can cause the cutting that I see in the photographs." J.A. at 207 (Prelim. Exam.), 323-24 (Trial Tr.). Dr. Graeser testified that the bottle as it existed at trial in 1992, had lost the sharpness of its edge, which it had back in 1979 and even in November 1991 at the time of the preliminary examination. J.A. at 324 (Trial Tr.). Drs. Bauserman and Cohle, who supervised Dr. Graeser's medical training, opined that Ringler's injuries were consistent with being struck by the bottle. J.A. at 267, 275 (Trial Tr.). Dr. Simpson, the original forensic pathologist consulted by the police, testified for the defense, and stated his opinion that the bottle could not have been the murder weapon because it lacked a sharp edge and reiterated his belief that Ringler was struck by a passing vehicle. J.A. at 348, 350 (Trial Tr.).

After reviewing the evidence, the jury convicted Souter of second-degree murder on March 13, 1992. The trial judge sentenced him to a term of 20 to 60 years' imprisonment. The Michigan Court of Appeals affirmed the jury verdict, rejecting Souter's claim that the twelve-and-a-half year delay between Ringler's death and his arrest denied him due process of law. On March 19, 1996, in lieu of granting leave to appeal, the Michigan Supreme Court remanded the case to the trial court to conduct an evidentiary hearing to

---

J.A. at 250 (Trial Tr.). Anna Mae Carpenter testified at trial that her door handle was broken and that Souter had come into the house that night and asked her for a bandage because he cut his finger on it. J.A. at 215 (Trial Tr.). Ms. Carpenter could not recall at what point during the evening Souter entered and asked for the bandage. Trial Tr. Vol. III at 129. During his investigation, Deputy Sheriff Sutton also cut his finger on the jagged door knob at the Carpenter house. J.A. at 308-09 (Trial Tr.).

address Souter's claim that he was prejudiced by the delay. On September 3, 1996, the trial court issued its opinion, finding that though Souter was prosecuted "with essentially the same evidence that was available in 1983," the delay was not deliberate and it did not prejudice his case. J.A. at 103 (Mich. Cir. Ct. Remand Op.). The Michigan Supreme Court denied leave to appeal on December 30, 1996.

Three years later, on November 15, 1999, Souter filed a motion for a new trial in the Newaygo County Circuit Court pursuant to Mich. Ct. R. 6.502, based on a claim of newly discovered evidence. Applying Mich. Ct. R. 6.508(D), the court denied the motion, finding that the new evidence could have been presented at trial and did not demonstrate a reasonably likely chance of acquittal. On July 24, 2000, the Michigan Court of Appeals denied Souter's application for leave to appeal because of his "failure to meet the burden of establishing entitlement to relief under MCR 6.508." J.A. at 149 (Mich. Ct. App. Order). The Michigan Supreme Court reached the same conclusion on January 30, 2001.

One year later, on January 30, 2002, Souter filed this petition for a writ of habeas corpus in the United States District Court for the Western District of Michigan, claiming violation of his right to due process and ineffective assistance of counsel. In support of his petition, Souter provided what he claimed was new evidence collected over the years, including:

(1)  An affidavit from Stephen R. Pletcher, a private investigator, who interviewed the bottle manufacturer and a forensic technician, both of whom stated there was no sharp edge on the bottle in 1979 as Dr. Graeser contended.

(2)  An affidavit from Dr. Cohle, recanting his trial testimony and concluding that "it is unlikely that the wounds on Kristy Ringler could have been inflicted by the bottle . . . ." J.A. at 109 (Cohle Aff.).

(3)  An affidavit from Dr. Bauserman, retreating from his trial testimony and claiming that "my testimony as to the object causing the external wound(s) would be speculative." J.A. at 113 (Bauserman Aff.). Dr. Bauserman defers to Dr. Cohle as to what object caused the wounds and discredits Dr. Graeser's forensic expertise.

(4)  An affidavit from Edward Gundy, the former police laboratory technician, stating that the bottle did not have a sharp edge in 1979 and that the blood found on the bottle's label is of little evidentiary value because 43% of Americans have the same blood type as Souter and Ringler.

(5)  Photographs, which Souter claims were not available at trial, which show that Ringler's clothes were soaked in blood.

The State of Michigan moved for summary judgment on the ground that Souter's petition was barred by the one-year limitations period applicable to habeas actions. The district court referred the case to a magistrate judge, who found that Souter had failed to file his habeas petition timely. The magistrate judge recommended that the district court deny the State's motion, however, because Souter "demonstrated credible new evidence of actual innocence which is sufficient for the limited purpose of equitably tolling the statute of limitations and permitting the court to reach the merits of the claim." J.A. at 185 (Magis. Judge Report & Rec.). The magistrate judge found that Souter's new evidence "chip[s] away at the rather slim circumstantial evidence upon which petitioner was convicted." J.A. at 185 (Magis. Judge Report & Rec.). The State timely filed objections to the magistrate judge's recommendation.

The district court did not reach the issue of whether an actual innocence exception to the statute of limitations exists, but instead found that Souter had failed to demonstrate his actual innocence. The court noted that while the new evidence was "undoubtedly favorable" to Souter, "it fails to establish factual innocence because none of [his] evidence conclusively establishes that the bottle could not have inflicted the wounds on the victim." J.A. at 189-90 (Dist. Ct. Op.). Moreover, the court found that the evidence itself

was not "new" but "merely a restatement of [Souter's] trial defense based upon the changed opinions of some of the prosecution's expert witnesses." J.A. at 190 (Dist. Ct. Op.). Therefore, the district court rejected the magistrate judge's recommendation of equitable tolling and granted the State's motion for summary judgment on the ground that Souter's petition was untimely. This appeal followed.

## II. ANALYSIS

"This court applies de novo review to the decision of the district court in a habeas corpus proceeding." *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001); *Allen v. Yukins*, 366 F.3d 396, 399 (6th Cir.), *cert. denied*, 125 S. Ct. 200 (2004). Furthermore, "[t]he dismissal of a habeas petition by the district court as barred by 28 U.S.C. § 2244's statute of limitations is reviewed de novo." *Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir.), *cert. denied*, 537 U.S. 1091 (2002). We review for clear error a district court's factual findings. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

In this appeal, we address the same two issues as were addressed by the district court below: (1) whether Souter's petition for writ of habeas corpus was filed timely; and (2) if the petition was untimely, whether the doctrine of equitable tolling should apply. Upon review, we conclude that Souter's petition was untimely, but that he has demonstrated a credible claim of actual innocence, which is sufficient for equitably tolling the statute of limitations and enabling a court to reach the merits of his underlying constitutional claims.

## A. Statute of Limitations

Souter's first argument is that his petition for a writ of habeas corpus, which was filed on January 30, 2002, was timely filed.

Before reaching the merits of the timeliness argument, we must first address whether Souter may even raise the issue on appeal. Though the overall recommendation favored Souter, the magistrate judge found that the petition was not filed within the one-year limitations period. Souter did not file any objections to the magistrate judge's report and recommendation, and accordingly, the district court did not address the timeliness issue below. In its brief, the State claims that by failing to object to the portion of the magistrate judge's report which found that his petition was not timely filed, Souter waived this argument. Resp. Br. at 3. We have long held that with regards to a magistrate judge's recommendation, "a party shall file objections with the district court or else waive right to appeal." *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). "By operation of this supervisory rule, only those specific objections to the magistrate's report made to the district court will be preserved for appellate review." *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). The United States Supreme Court affirmed the *Walters* rule, holding that it "is a valid exercise of the supervisory power" of the court of appeals. *Thomas v. Arn*, 474 U.S. 140, 155 (1985). While we have regularly enforced the *Walters* rule, we have also noted that "[i]t plainly is not a jurisdictional rule; the court of appeals retains subject matter jurisdiction over the appeal regardless of the untimely filing or nonfiling of objections." *Kent v. Johnson*, 821 F.2d 1220, 1222 (6th Cir. 1987). In *Thomas v. Arn*, the Supreme Court "emphasize[d] that, because the [*Walters*] rule is a nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interests of justice." 474 U.S. at 155.

In this case, we conclude that it would be inappropriate to apply the *Walters* rule to bar review of Souter's timeliness argument. When the magistrate judge issued his report, we had yet to decide *Abela v. Martin*, 348 F.3d 164 (6th Cir. 2003) (en banc), *cert. denied*, 124 S. Ct. 2388 (2004), which clarified the one-year limitations period under § 2244(d) and which is potentially dispositive of the issue in this case. The magistrate judge reasoned that the limitations period commenced on the date of the last new affidavit, September 17, 1999, from which point Souter had one year to file his habeas petition. The limitations period is tolled while state-court post-conviction or collateral proceedings are pending. 28 U.S.C. § 2244(d)(2). Because Souter filed a motion for a new trial in state court on November 15, 1999, the

limitations period was tolled fifty-nine days after the date of the new affidavit.[3]  The collateral state-court proceedings continued until the Michigan Supreme Court denied leave to appeal on January 30, 2001.  The petition for a writ of habeas corpus was filed exactly one year later, on January 30, 2002, fifty-nine days beyond the one-year limitations period.  Thus, the magistrate judge concluded that Souter's petition was untimely.

Since that decision, we held in *Abela* that state-court proceedings are considered to be still pending during "the time for seeking Supreme Court review of the state's final judgment on that application independent of whether the petitioner actually petitions the Supreme Court to review the case."  348 F.3d at 172-73.  The effect of *Abela* is to toll the limitations period for an additional ninety days beyond the date of the final state-court judgment to account for the certiorari window, regardless of whether a petition for a writ of certiorari is ever filed.  Therefore, in this case, the limitations period would have been tolled until April 30, 2001, ninety days after the Michigan Supreme Court's decision to deny Souter leave to appeal.  Assuming that the limitations period commenced on September 17, 1999, and tolling the period consistent with the *Abela* holding, Souter's petition for habeas relief would have been filed approximately 334 days from the date of the last affidavit — thirty days prior to the expiration of the one-year limitations period.  Because we did not clarify the issue until after Souter's objection period had passed, he should not be barred from raising this issue on appeal.

Furthermore, we have held that a party, who substantially prevails in a magistrate judge's recommendation, does not waive the right to appeal secondary issues resolved against him by failing to object to the recommendation.  In a similar case, we stated that:

> [a]lthough the magistrate judge proposed that the secondary issue of the admissibility of the writings be resolved in [the appellant's] favor, he nonetheless concluded that [the appellee] should prevail on its motion for summary judgment.  If we were to require a party in the [appellee's] position to present objections to a magistrate judge's proposed adverse resolution of a secondary issue, we would force that party to articulate objections to a recommendation that it prevail.  Such a requirement would only frustrate the judicial economy and litigant expense policies that underlie the *Walters* rule.

*Turpin v. Kassulke*, 26 F.3d 1392, 1399-1400 (6th Cir. 1994), *cert. denied*, 513 U.S. 1118 (1995).  In this case, the magistrate judge found that Souter's petition was untimely, but recommended that the State's motion for summary judgment be denied on the ground of equitable tolling.  The interest of judicial economy would be frustrated by requiring that Souter file objections to all the adverse portions of the report, even though he prevailed on the overall recommendation.  Therefore, we deem the *Walters* rule inapplicable and the issue of timeliness not waived in this appeal.

On the merits of the timeliness issue, we conclude, however, that Souter has failed to make a persuasive argument that his habeas petition was timely filed.  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) established a one-year limitations period during which a state prisoner can bring a federal habeas corpus petition.  28 U.S.C. § 2244(d)(1).  The statute of limitations begins to run from the latest of four events, one of which is "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  Souter claims that several pieces of new evidence, which he has collected over the past several years, form the factual predicate for his habeas corpus claim.  The most recent piece of this new evidence is the affidavit of Edward L. Gundy, the former police laboratory technician, which is dated September 17, 1999.  As was demonstrated above, if the Gundy affidavit is considered new evidence forming a factual predicate for his habeas claim, Souter's petition would have been filed thirty days prior to the expiration of the limitations

---

[3]In his report and recommendation, the magistrate judge incorrectly calculated that sixty-one days elapsed from September 17, 1999, to November 15, 1999, rather than fifty-nine.  The calculation error is not significant however.

period. The State argues, however, that the Gundy affidavit does not provide any new evidence, but merely reexamines the bottle's physical characteristics yet again. Resp. Br. at 7-8.

There are two statements in the Gundy affidavit upon which Souter relies for his habeas claim. Gundy states that based on his observations of the bottle in 1979, it did not have a sharp edge, and therefore, Dr. Graeser's statement to the contrary "is <u>not</u> a statement of fact." J.A. at 123 (Gundy Aff.). Furthermore, Gundy states that the blood stain on the label of the bottle provides very little evidentiary value because 43% of the American population has the same type of blood. J.A. at 124 (Gundy Aff.). The State is correct that neither of these two statements can be considered new evidence creating a factual predicate for a habeas petition. First, with regards to the value of the blood evidence, at trial Gundy himself testified that both Ringler and Souter have type A blood and that he could not determine which one, or if someone else with type A blood, left the stain on the label. J.A. at 288-89 (Trial Tr.). Second, with regards to whether the bottle had a sharp edge in 1979, Dr. Simpson testified for the defense at trial that the bottle did not currently have a sharp edge and that there were no signs that the edge had been worn down over time. J.A. at 348 (Trial Tr.). Thus, both of the statements in the Gundy affidavit are not new evidence, but rather merely cumulative to the evidence already presented by the defense at trial. Therefore, the Gundy affidavit cannot form the newly discovered factual predicate, which commences the statute of limitations period.

The next most recent piece of new evidence which Souter claims provides the factual predicate of his habeas petition is the affidavit of Dr. Bauserman, the medical examiner, which is dated July 27, 1999. At trial, Dr. Bauserman testified that the two wounds on Ringler's head were consistent with being struck by the bottle. J.A. at 263-65, 267-68 (Trial Tr.). Specifically, Dr. Bauserman stated "[t]he question was proposed to me could these and do these photographs incriminate this bottle, and my conclusion is that they are strong evidence in support of that bottle causing those injuries — not to the exclusion of all other possible bottles." J.A. at 267 (Trial Tr.). In his 1999 affidavit, Dr. Bauserman no longer stands by his trial testimony about the bottle, stating that "my opinion as to damage to the brain and cause of death would be informed; my testimony as to the object causing the external wound(s) would be speculative." J.A. at 113 (Bauserman Aff.). Moreover, Dr. Bauserman states that Dr. Cohle's "education, training and experience make him highly qualified as a forensic pathologist, especially as to the causation of skin wounds, and I would defer to his conclusions on such issues in this case, since this is more his specialty than mine." J.A. at 113 (Bauserman Aff.). We need not reach a conclusion about whether or not the Bauserman affidavit should be considered new evidence, because assuming *arguendo* that it is, Souter has failed to file his petition within one-year of its discovery.

The Bauserman affidavit was signed on July 27, 1999, which would have commenced the one-year limitations period. One hundred and eleven days elapsed before Souter filed his motion for a new trial in state court on November 15, 1999, which tolled the limitations period. The state court proceedings were pending until the certiorari window closed on April 30, 2001. Two hundred seventy-five days passed from that date until Souter filed his petition for habeas corpus in district court on January 30, 2002. Thus, a total of three hundred eighty-six days elapsed from the receipt of the Bauserman affidavit to the filing of the habeas petition. Therefore, even if we were to conclude that the Bauserman affidavit was new evidence providing a factual predicate for Souter's habeas claim, he failed to file his petition within the one-year limitations period set forth in § 2244(d)(1)(D). The district court was correct to hold that Souter's petition for habeas relief was untimely.

## B. Equitable Tolling for Actual Innocence

Souter's next argument is that, even if his petition for a writ of habeas corpus was untimely, he should be entitled to equitable tolling because the newly discovered evidence establishes a credible claim of actual innocence.

We have held that "[b]ecause AEDPA's one-year statute of limitations is not jurisdictional, a petitioner who misses the deadline may still maintain a viable habeas action if the court decides that equitable tolling is appropriate." *Allen*, 366 F.3d at 401; *Dunlap v. United States*, 250 F.3d 1001, 1003 (6th Cir.), *cert. denied*, 534 U.S. 1057 (2001). We have cautioned, however, "that equitable tolling relief should only be granted sparingly." *Cook*, 295 F.3d at 521; *Dunlap*, 250 F.3d at 1008. In determining whether equitable tolling should apply, a court must consider the following five factors:

> (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

*Dunlap*, 250 F.3d at 1008 (citing *Andrews v. Orr*, 851 F.2d 146, 152 (6th Cir. 1988)). By satisfying the five *Andrews* factors, a petitioner demonstrates good cause for the procedural default. We have stated, however, that "[t]hese factors are not necessarily comprehensive and they are not all relevant in all cases. Ultimately, the decision whether to equitably toll a period of limitations must be decided on a case-by-case basis." *Miller v. Collins*, 305 F.3d 491, 495 (6th Cir. 2002) (citing *Cook*, 295 F.3d at 521).

In the present case, Souter is not arguing for equitable tolling based on any of the *Andrews* factors; instead, he argues that because he has made a credible showing of actual innocence, equitable tolling should be applied to allow a court to consider his constitutional claims. Pet. Br. at 19. The United States Supreme Court has held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

Following *Schlup*, Congress codified an actual innocence exception to the procedural bar on successive habeas petitions in AEDPA, but did not include an exception with regards to the new limitations provisions. 28 U.S.C. § 2244(b)(2)(B)(ii). Neither the Supreme Court nor this court has specifically addressed the issue of whether an actual innocence exception to the one-year limitations period exists. In *Workman v. Bell*, on a motion for rehearing en banc as to which this court divided equally, Judge Siler, joined by six other judges, wrote in dicta that "if a prisoner purposefully or by inadvertence lets the time run under which he could have filed his petition, he cannot file a petition beyond the statutory time, *even if he claims actual innocence.*" 227 F.3d 331, 342 (6th Cir. 2000) (en banc) (Siler, J. opinion opposing reh'g en banc), *cert. denied*, 531 U.S. 1193 (2001) (emphasis added). A number of panels of this court have[4] addressed arguments regarding an actual innocence exception, without specifically resolving the issue.

---

[4] One district court in this circuit has resolved the issue and found "that an actual innocence exception exists to the statute of limitations contained within § 2244(d)(1)." *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001). *See also Brooks v. McKee*, 307 F. Supp. 2d 902, 907 (E.D. Mich. 2004) ("At least one judge in this District, however, has held that an actual innocence exception exists that would toll the one year limitations period contained in § 2244(d)(1)."); *Grayson v. Grayson*,

*See, e.g.*, *Townsend v. Lafler*, No. 02-2151, 2004 WL 1098757, at *3 (6th Cir. May 14, 2004); *Allen*, 366 F.3d at 405; *Whalen v. Randle*, No. 00-4462, 2002 WL 409113, at *7 (6th Cir. Mar. 12, 2002); *Channels v. McLemore*, No. 01-1931, 2002 WL 112542, at *2 (6th Cir. Jan. 25, 2002), *cert. denied*, 537 U.S. 1090 (2002); *Owens v. Stine*, No. 01-1200, 2001 WL 1217001, at *2 (6th Cir. Oct. 2, 2001), *cert. denied*, 536 U.S. 965 (2002); *Saylor v. Mack*, No. 00-4357, 2001 WL 1141294, at *2 (6th Cir. Sept. 17, 2001). In each of these cases, we adopted the reasoning of the Second Circuit which declined to "reach the question of whether the Constitution requires an actual innocence exception to § 2244(d)(1) unless the petitioner was able to demonstrate that he was actually innocent of the charges for which he was convicted." *Whalen*, 2002 WL 409113 at *7 (citing *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 114 (2d Cir.), *cert. denied*, 531 U.S. 873 (2000)). In *Lucidore*, as well as all the cited cases before this court, the habeas petitioner failed to demonstrate actual innocence, and therefore, the court never had to reach the constitutional issue. Adhering to this principle of judicial restraint, we too will resolve the issue of whether Souter has put forth a credible claim of actual innocence before addressing the existence of the exception itself.

The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."[5] *Id.* at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

We conclude that Souter's conviction is such a rare and extraordinary case. In his habeas petition, Souter has presented new evidence collected over the past several years that does raise sufficient doubt about his guilt and that undermines confidence in the result of his trial. The only evidence which directly

---

185 F. Supp. 2d 747, 752 (E.D. Mich. 2002) (relying on the *Holloway* holding that an actual innocence exception exists). In *Holloway*, the district court concluded that to use the AEDPA statute of limitations "to preclude a petitioner who can demonstrate that he or she is factually innocent of the crimes that he or she was convicted of would violate the Suspension Clause contained in U.S. Const. Art. I, § 9 cl. 2, as well as the Eighth Amendment's ban on cruel and unusual punishment." 166 F. Supp. 2d at 1190.

[5]In AEDPA, Congress adopted a more stringent actual innocence exception in the successive-petition and evidentiary-hearing provisions, requiring that the factual predicate of the claim could not have been discovered earlier and a showing "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. §§ 2244(b)(2)(B); 2254(e)(2). The adoption of a narrower actual innocence exception in these two specific instances did not alter the general *Schlup* actual innocence standard applicable in cases involving other types of procedural default. Accordingly, after AEDPA, we have continued to apply the *Schlup* actual innocence standard unless the case falls within one of the two statutorily-defined areas requiring the heightened standard. *See Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004). Furthermore, the United States Supreme Court has continued to apply the more lenient *Schlup* standard in defining a miscarriage of justice in other circumstances, which reinforces the conclusion that Congress was not acting to alter the actual innocence standard beyond the two specific provisions in AEDPA. *See Calderon v. Thompson*, 523 U.S. 538, 558 (1998) ("It is true that the miscarriage of justice standard we adopt today is somewhat more lenient than the standard in § 2244(b)(2)(B).").

Though we have not previously determined whether an actual innocence exception exists, we have concluded previously that the *Schlup* "more likely than not" standard was the proper approach in evaluating a claim for equitable tolling based on actual innocence. *Allen v. Yukins*, 366 F.3d 396, 405 (6th Cir.), *cert. denied*, 125 S. Ct. 200 (2004). As the Second Circuit recently stated, "[b]ecause the interests that must be balanced in creating an exception to the statute of limitations are identical to those implicated in the procedural default context, we see no reason not to apply the *Schlup* standard in the tolling context." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004).

ties Souter to Ringler's death is the bottle. At trial, the State relied on three pathologists, Drs. Graeser, Bauserman, and Cohle, all of whom testified to varying degrees of certainty that the bottle was the cause of Ringler's wounds. Since that time, Dr. Bauserman, who performed the autopsy and who was the only one who actually viewed Ringler's body, has retreated from his trial testimony and stated he was *only speculating* when he testified that there was strong evidence that the bottle caused the injuries. J.A. at 113 (Bauserman Aff.). Dr. Cohle, the only one of the three that is a certified forensic pathologist, has recanted his trial testimony, and he now states that, based on his education and experience and examining autopsy slides which he had not seen previously, "it is *unlikely* that the wounds on Kristy Ringler could have been inflicted by the bottle." J.A. at 109 (Cohle Aff.) (emphasis added). Moreover, Dr. Cohle states that he was "strongly influenced in 1992" to opine that the bottle caused the injuries, because Dr. Graeser had claimed that "the bottom of the bottle [was] sufficiently sharp that if one ran one's finger over it[,] it would cut the skin. While [he] did not observe such an edge on the bottom of the bottle in 1992, [he] relied on Dr. Graeser's statement that such a sharp edge did exist in 1979." J.A. at 109 (Cohle Aff.).

The existence of the sharp edge in 1979 is critical in linking the bottle to the uniqueness of the wounds.[6] Souter has interviewed the director and the senior vice president of operations from Hiram Walker & Sons, Ltd. ("Hiram Walker"), the manufacturer of the bottle, who state that "[t]he structure of the molds [used in manufacturing of the bottle] *precludes the creation* of spurs or sharp edges occurring at the bottom, or any other location on the bottle." J.A. at 117 (Steven Pletcher Aff.) (emphasis added). Moreover, the Hiram Walker officials state that "[t]here is nothing in the chemistry/composition of the glass that would cause, during manufacturing, the creation of a sharp edge or spur on the glass." J.A. at 118 (Pletcher Aff.). Hiram Walker has distributed over one hundred million similar bottles, but "has never received any complaints, or any information indicating cuts or injury arising from sharp edges or glass spurs extant on the bottom of the Canadian Club pint bottle container." J.A. at 117 (Pletcher Aff.). Souter also presented evidence from Thomas Kubic, a forensic scientist, who examined the bottle and autopsy photos and found "there is no and never was any sharp edge or protuberance as described in the statements, that could have caused the wounds shown in the photos." J.A. at 147 (Kubic Rep.). Edward Gundy, the police laboratory technician who examined the bottle in 1979, states that Dr. Graeser's testimony of an edge sharp enough to cut a finger "is not a statement of fact according to my observations in August and September of 1979." J.A. at 123 (Gundy Aff.).

Finally, Souter has submitted three color photos of the victim's clothing that he argues were unavailable at trial, and which show large dark, reddish stains on the back, which he claims to be blood. The existence of these photos is relevant for several reasons. First, the clothes which Ringler was wearing the night she died were unavailable at trial twelve years later. J.A. at 209 (Trial Tr.). Second, several of the witnesses testified that there was very little blood on her clothes. J.A. at 245, 246, 249, 297 (Trial Tr.). Third, witnesses who saw Souter that evening, including Sheriff's Deputy Sutton who drove him back to his friend's house, testified that there was no blood visible on him, and the police laboratory found no blood on his boots. J.A. at 230, 310 (Trial Tr.), 125 (Police Lab. Rep.). At trial, the State argued that the absence

---

[6] At the preliminary examination, Dr. Graeser explained that:

[t]he wound is unique. It has cutting characteristics, and yet, the injuries are also those of severe blunt force, and that is uniquely the same. If you look at the very bottom of that bottle, it has about a one sixteenth of an inch rim that's very sharp. If you would take your hand and rub it across it hard, you'd probably cut yourself. That can cause the cutting I see in the photographs, and yet, if it were just a sharp instrument like a hatchet, it would have cut clear through the skull. The skull wasn't damaged, or at least it wasn't broken or cut. So that the rest of the bottle, once the sharp part had cut through the tissue, then the blunt part of the bottle connected with the head or can connect with the head and import — in part a lot of force to cause all of the damage to the brain that was seen at the autopsy.
I'm saying that in my experience that's the only object I can think of that would produce it.

J.A. at 207-08 (Prelim. Exam.). In its closing argument at trial, the State urged the jury to "[r]emember how Dr. Graeser said that it was much sharper back in November than it is now. Well, if you look at that closely with a magnifying glass, you will see little chips are out of it so it has been worn down." J.A. at 376 (Trial Tr.).

of blood on Souter was consistent with the absence of blood on Ringler.[7] These photos, however, show that the injuries did in fact cause substantial bleeding, thereby undermining the State's argument. The photos depict large stains on the back of the shirt which would be consistent with eyewitness accounts of an absence of blood visible while the victim was lying on her back in the road, but inconsistent with the State's theory of the absence of blood on Souter. The photographs are even more damaging to the State's case given Dr. Graeser's theory that the small amount of blood on the road indicates that the victim was hit elsewhere, then carried and placed at the scene. J.A. at 321 (Trial Tr.). Given the size of the stain visible in the photos, it is implausible that Souter would have been able to transport the victim without getting significant blood on himself.

We conclude that this new evidence — the changed testimony of Drs. Bauserman and Cohle, the statements from the bottle manufacturer, the additional evidence of the forensic scientist and police laboratory technician, the photos of the bloody clothes — when taken together "'chip[s]' away' at the rather slim circumstantial evidence upon which [Souter] was convicted." J.A. at 185 (Magis. Judge Report & Rec.). Both the State and the district court claim that the evidence presented in the habeas petition cannot form the basis of an actual innocence claim. In finding the claim of actual innocence incredible, the district court stated that much of this evidence is not new, but rather merely restates Souter's trial defense. The State argues that the evidence fails to meet "the exacting standard . . . of actual innocence on habeas review." Resp. Br. at 13. We disagree and will address each of their arguments in turn.

First, with regards to the affidavit of Dr. Cohle, the State argues that it cannot be used to support an actual innocence claim because his changed opinion is not based on new evidence, but rather "a second look at the same bottle he handled." Resp. Br. at 13-14. That argument, however, mischaracterizes the nature of Dr. Cohle's testimony. Dr. Cohle was testifying at trial as an expert witness, and therefore, it is his opinion itself, rather than the underlying basis for it, which is the evidence presented. *See, e.g.*, Fed. R. Evid. 702 (permitting an expert to testify in the form of an opinion at trial). Therefore, if Dr. Cohle has changed his expert opinion, the evidence itself has changed, and can most certainly be characterized as new. By analogy, if an eyewitness subsequently remembered additional details, those new details would form the basis of new evidence. This new opinion is even more reliable than an eyewitness account, however, because it is not merely based on a renewed look at the bottle, but rather it is a result of his increased education, training, and experience, as well as examination of autopsy slides which he had not seen before. Furthermore, the State's argument is belied by the fact that the underlying basis for Dr. Cohle's opinion has indeed changed. He states that his trial testimony was "strongly influenced" by Dr. Graeser's statement that the bottle had a sharp edge in 1979, which was not present at trial in 1992. J.A. at 109 (Cohle Aff.). With the existence of the sharp edge now called into question, however, Dr. Cohle concludes that it is unlikely that the bottle caused the victim's wounds.

The State dismisses the value of Dr. Cohle's changed testimony, arguing that it is "merely cumulative" to the trial testimony of Dr. Simpson. Resp. Br. at 13-14. While it is true that Dr. Simpson already testified for the defense that the bottle was not the cause of the injuries, Dr. Cohle's affidavit is not merely an additional expert opinion reaching the same conclusion. The retractions of Drs. Cohle and Bauserman not only serve to bolster the defense's argument, but also undermine the State's side by withdrawing their original trial opinions. Put another way, the new affidavits do not merely add to the

---

[7]The County Prosecutor stated in his closing:
Now, I don't know how the blood didn't spatter. I don't know how it didn't get on his clothes. Apparently it wasn't noticeable to anybody that saw him later but what — but what was noticeable to everybody that saw Kristy later was there wasn't any blood on her clothes. So there — there — *If there wasn't any on her, it makes just as much sense that there wasn't much, if any, on his.*
J.A. at 402 (Trial Tr.) (emphasis added).

defense, but also deduct from the prosecution. As a result, the affidavits can be consider "new reliable evidence" upon which an actual innocence claim may be based.[8]

Similar to the State's argument, the district court found the changed opinions of Drs. Cohle and Bauserman were insufficient to support a showing of actual innocence because Dr. Graeser's opinion still stands. J.A. at 190 (Dist. Ct. Order). The district court's conclusion fails to recognize the relative weight of the three expert witnesses' testimony. Of the three, Dr. Bauserman was the only one who actually examined Ringler's body. At closing, the State argued to the jury the importance of Dr. Bauserman's opinion:

> [t]he doctors [sic] that had the best opportunity to observe and make — offer an opinion as to what had happened in terms of whether or not this bottle caused those injuries was Dr. Bauserman. He did the autopsy. He was able — he saw the wound. It is not just the pictures of the wound.

J.A. at 375 (Trial Tr.). The trial court also noted the importance of Dr. Bauserman's opinion, because he "had the opportunity to examine the body of the victim, and, as pointed out by the defense, photographs are not a complete substitute for the opportunity to actually observe the injuries." J.A. at 133 (Mich. Cir. Ct. Order Denying New Trial). Dr. Bauserman now states that his opinion that the bottle caused the wounds was speculation, and he defers to Dr. Cohle as to the true cause. With regard to Dr. Cohle, he is the only one of the State's three medical experts that is a board-certified, forensic pathologist. Dr. Cohle states that his testimony at trial was based on a limited review and that "the wound edges could be stretched to confirm such a shape or the bottle could be positioned and laid over the wound in such a position to suggest that it might have fit the wound," but after a more thorough examination of the autopsy photographs, it is clear that "the shape of the wound on the forehead does not confine precisely to the edge of a pint whiskey bottle." J.A. at 109 (Cohle Aff.).

With Drs. Bauserman and Cohle withdrawing their expert opinions that the bottle caused the injuries, the prosecution's sole remaining expert witness is Dr. Graeser, who was trained by Drs. Bauserman and Cohle and is the most inexperienced of the three. At trial, after being asked about Dr. Graeser's qualifications, both Drs. Bauserman and Cohle testified to the deficiencies in his educational progress, and noted that he did not sit for the anatomical/clinical pathology boards. J.A. at 108 (Cohle Aff.), 114 (Bauserman Aff.) (both describing their trial testimony). Dr. Bauserman states in his affidavit that Dr. Graeser was "not absorbing the body of knowledge necessary to pass his examinations," and "[r]ather than allow him to take the boards and fail, which would have been a black mark against him and against our program at Blodgett, he was placed on probation or his residency time [was] extended." J.A. at 114 (Bauserman Aff.). Given the deficiencies in Dr. Graeser's education and training, the State justifiably relied on the concurring opinions of Drs. Bauserman and Cohle to bolster Dr. Graeser's conclusions. *See* J.A. at 375 (Trial Tr.) (arguing to the jury the importance of the opinions of Drs. Bauserman and Cohle). With

---

[8]The State argues for a strictly literal reading of the Supreme Court's holding in *Schlup*, which states that a petitioner must support "allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." 513 U.S. at 324. The State argues that Dr. Cohle's affidavit is not new because Dr. Simpson testified for the defense that the bottle could not have caused the injuries. Resp. Br. at 14-15. Similarly, the State argues that Dr. Bauserman's affidavit where he claims his trial opinion was merely speculation, is not new *exculpatory* scientific evidence. Resp. Br. at 16 (emphasis added). A correct reading of *Schlup* reveals that the examples following the words "new reliable evidence" were not meant to be an exhaustive list of everything upon which an actual innocence claim may be based. The Court in *Schlup* specifically stated that "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments." 513 U.S. at 330. A prosecution witness recanting his trial testimony certainly falls under that scope. *See, e.g., Workman*, 227 F.3d at 337-38 (en banc) (Merritt, J. opinion supporting reh'g en banc) (noting that recantation of a prosecution witness could be used in an actual innocence claim). That the recantation may be cumulative to the defense's evidence does not minimize its effectiveness in weakening the prosecution's case. Moreover, not only do the Bauserman and Cohle affidavits withdraw their own trial testimony, they also call into question the competency of Dr. Graeser, the only remaining expert who stands behind the theory of the bottle as the source of the victim's injuries.

those two supporting opinions withdrawn, however, a reasonable juror would have difficulty adopting Dr. Graeser's theory over the conclusion of Drs. Simpson and Cohle, both of whom are board-certified forensic pathologists.

With regards to the absence of a sharp edge on the bottom of the bottle, the district court found that it was "a significant, if not the central, issue at trial." J.A. at 190 (Dist. Ct. Order). The district court correctly noted that the bottle was examined by both prosecution and defense witnesses, the absence of a sharp edge was brought to the attention of the jury, and the bottle was in the jury room during deliberations. J.A. at 191 (Dist. Ct. Order). As a result, the district court concluded "the shape and condition of the bottle is not new evidence." J.A. at 191 (Dist. Ct. Order). The district court failed to consider, however, that the central issue in this case was not whether the bottle *at trial* had a sharp edge which the jury could discern from examining it in deliberations, but rather whether one existed *twelve years earlier*. The prosecution's theory rested on Dr. Graeser's assertion that at the time of the incident the bottle had a sharp edge, which "if you would run your hand across it quickly, I think you would cut it." J.A. at 323 (Trial Tr.). Dr. Simpson, the defense's expert witness, disputed that account, finding that the bottle lacked a sharp edge and that nothing indicated that it might have had one twelve years earlier. J.A. at 348 (Trial Tr.). In convicting Souter, the jury obviously credited Dr. Graeser over Dr. Simpson. The new affidavits from Thomas Kubic, a forensic scientist, and Edward Gundy, the police laboratory technician, shed no new light on the issue, but are merely cumulative to Dr. Simpson's testimony at trial. By contrast, the Pletcher affidavit does provide new evidence — specifically that the shape of the molds used in manufacturing the bottle "*precludes the creation* of spurs or sharp edges occurring at the bottom, or any other location on the bottle." J.A. at 117 (Pletcher Aff.) (emphasis added). This is not simply another expert witness testifying as to what he can discern existed in 1979 from examining the present-day bottle's edge, but rather evidence of the manufacturing process of the bottle itself. According to the Hiram Walker executives, it is factually impossible that the bottle, as it existed in 1979, could have had a sharp edge as Dr. Graeser contended. Furthermore, over one hundred million similar bottles have been distributed worldwide without any complaints of injuries. These new facts provided by the manufacturer severely undermine the prosecution's theory that the bottle could have caused the injuries to the victim. While the district court is correct that the edge of the bottle was a central issue at trial, it erred in finding the Pletcher affidavit did not provide any new insight on the issue.

Finally, the district court also dismissed the significance of the photos of the victim's bloody clothes, finding them consistent with the investigating detective's theory that Ringler was attacked in the roadway. J.A. at 191 (Dist. Ct. Order). The detective's theory, however, was not the one put forth to the jury. At trial, the prosecution argued that the absence of blood on the roadway indicated that Ringler was attacked elsewhere and carried several hundred yards onto the road. J.A. at 378, 400 (Trial Tr.). In its brief, the State concedes that the photos are inconsistent with that theory but argues that they only prove that the detective's view was the correct one, not that Souter was innocent of the crime.[9] Resp. Br. at 17. Of course accepting

_____

[9] In the alternative, the State argues that the photos cannot be used to establish actual innocence because they are not new evidence. Resp. Br. at 17. In dismissing Souter's motion for a new trial, the state trial court, without citing any place in the record for support, found the parties knew of the photographs' existence at trial in 1992 and found their unavailability could have been resolved during the defendant's prior appeals. J.A. at 133-34 (Mich. Cir. Ct. Order Denying New Trial). Assuming *arguendo* that the state trial court's finding is correct, the State's argument is unpersuasive. The State confuses the standard set forth under Mich. Ct. R. 6.508(D) for a new trial with the standard for actual innocence claims set forth by the Supreme Court in *Schlup*. Under Michigan law, to prevail on a motion for a new trial, a petitioner must show "the substance of the evidence, and not merely its materiality, must have been discovered *after the trial*." *People v. LoPresto*, 156 N.W.2d 586, 590 (Mich. Ct. App. 1968) (emphasis added). By contrast, to support a claim for actual innocence, a petitioner must support his arguments "with new reliable evidence . . . that was *not presented at trial*." *Schlup*, 513 U.S. at 324 (emphasis added). The Supreme Court noted that "[b]ecause such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* Thus, even if the photographs of the bloody clothes were available in 1992, there is no evidence in the record that they were ever presented to the jury and therefore, are new evidence in support of Souter's actual innocence claim under *Schlup*. *See, e.g., Allen*, 366 F.3d at 405-06 (assessing a habeas petitioner's actual innocence claim by evaluating new statements from co-defendants, who could have testified at trial, but not evidence already presented to the jury).

the detective's view raises the question, which motivated the prosecution to dismiss the theory in the first place, of why there was not more blood in the roadway. Moreover, the substantial blood on the victim's clothes is probative of more than just the location of the attack. The State has failed to reconcile the substantial blood on the victim's clothes with the absence of blood on Souter's. Even accepting Sutton's view that Ringler was attacked in the roadway, a reasonable juror would conclude that the blows caused severe bleeding which should have spattered onto the attacker or at least on the label of the bottle used to inflict them.[10]

In sum, after evaluating the totality of the evidence offered at trial and the new evidence presented in his habeas petition, we conclude that Souter has met his burden of establishing a gateway actual innocence claim. This court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. If "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," the petitioner may "pass through the gateway and argue the merits of his underlying claims."[11] *Id.* at 327, 316. In this case, there are several circumstantial facts which implicate Souter in the murder of Ringler: it was 3:00 A.M. in a rural area of Michigan; he was the last person to be seen with the victim; they were engaged in amorous activities until she walked off; he admitted to following her down the road before turning around and returning to the party; the victim's body was discovered neatly laid out in the middle of the road; and her clothes were not torn or tattered, suggesting she was not hit by a car. The facts exculpating him from the crime are as follows: he was severely intoxicated that night; there was no blood on his clothes or his boots; there was no blood or hair evidence on the bottle except the trace amount on the label; and pieces of glass were found in the gauze bandages around her head and on her jeans that do not match the bottle. The circumstantial facts, when taken together, are insufficient to establish Souter's guilt. The only direct evidence linking Souter to Ringler's death is the bottle. In light of the new evidence — the recanted testimony of Dr. Bauserman, the changed opinion of Dr. Cohle, the shape of the molds used in the manufacturing process, Hiram Walker's history of distributing the bottle without incident, the photos of the bloody clothes — we find that "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." *Schlup*, 513 U.S. at 332. Souter has presented new evidence which raises sufficient doubt about his guilt and undermines confidence in the result of his trial.

Having determined that Souter has put forth a credible claim of actual innocence, we must next resolve the issue of whether an actual innocence exception to AEDPA's statute of limitations exists.[12] The majority of the courts of appeals which have addressed this question have allowed for equitable tolling

---

[10] The State argues that Sutton's theory accounts for why Souter did not have blood on his clothes and why so little blood was found at the scene. Resp. Br. at 17. The State fails to explain how the theory does that. Sutton's theory was rejected by the prosecution specifically because there was so little blood at the scene. J.A. at 378, 402 (Trial Tr.).

[11] In its brief, the State argues that it is not enough for petitioner to show that the prosecutor could no longer prove his guilt beyond a reasonable doubt," but rather Souter must "prove that he is innocent." Resp. Br. at 20. Similar to the State's argument, the district court held that Souter failed "to establish actual innocence because none of [his] evidence conclusively establishes that the bottle could not have inflicted the wounds on the victim." J.A. at 190 (Dist. Ct. Op.). These extraordinarily high standards are appropriate for free-standing actual innocence claims, rather than gateway claims used to overcome procedural default. *See Herrera*, 506 U.S. at 429 (White, J. concurring) (requiring petitioners bringing substantive actual innocence claims to demonstrate that "no rational trier of fact could [find] proof of guilt beyond a reasonable doubt"). The Supreme Court has noted the distinction between substantive and procedural actual innocence claims, and that a lower burden of proof is appropriate in the latter. *See Schlup*, 513 U.S. at 330 (noting that in substantive claims, "the mere existence of sufficient evidence to convict would be determinative of petitioner's claim," while procedural claims involve "what reasonable triers of fact are likely to do"). Souter need not demonstrate conclusively that bottle could not have caused the injuries, but rather he must raise sufficient new facts such that it is more likely than not that no reasonable juror would have found the defendant guilty. "A petitioner need not show that he is actually innocent of the crime he was convicted of committing; instead he must show that a court cannot have confidence in the outcome of the trial." *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002) (internal citations omitted).

[12] Though our opinion in this case deals with the limitations period established in § 2244(d)(1), our holding also applies to the similar limitations period established in § 2255, which governs prisoners in federal custody.

based on actual innocence under certain circumstances. *See Gildon v. Bowen*, 384 F.3d 883, 887 (7th Cir. 2004) (adopting the Eighth Circuit's approach in *Flanders*); *Flanders v. Graves*, 299 F.3d 974, 978 (8th Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003) (requiring that equitable tolling based on a claim of actual innocence be accompanied by "some action or inaction on the part of the respondent that prevented [the petitioner] from discovering the relevant facts in a timely fashion, or, at the very least, that a reasonably diligent petitioner could not have discovered these facts in time to file a petition within the period of limitations"); *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000) (holding that equitable tolling is appropriate "when a prisoner is actually innocent" and "diligently pursue[s] his federal habeas claims"); *Felder v. Johnson*, 204 F.3d 168, 171 & n.8 (5th Cir.), *cert. denied*, 531 U.S. 1035 (2000) (finding that a claim of actual innocence "does not constitute a rare and exceptional circumstance," but suggesting that "a *showing* of actual innocence" might). *But see David v. Hall*, 318 F.3d 343, 347 (1st Cir.), *cert. denied*, 540 U.S. 815 (2003) (holding that prisoners "who may be innocent are constrained by the same explicit statutory or rule-based deadlines as those against whom the evidence is overwhelming"). To answer the question of whether an actual innocence exception to the statute of limitations exists, we begin our analysis with the text of the statute itself.

The Supreme Court has long held that "the power to award the writ [of habeas corpus] by any of the courts of the United States[] must be given by written law," and the "judgments about the proper scope of the writ are normally for Congress to make." *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (internal citations omitted). The Eighth Circuit has noted correctly that § 2244(d)(1) "says nothing about actual innocence, even though other parts of AEDPA, enacted at the same time, do refer to this doctrine." *Flanders*, 299 F.3d at 977; *compare* 28 U.S.C. § 2244(d)(1) *with* 28 U.S.C. § 2244(b)(2)(B)(ii) *and* 28 U.S.C. § 2254(e)(2)(B). The court held that "[i]t is not our place to engraft an additional judge-made exception onto congressional language that is clear on its face." *Id.* Even the *Flanders* court realized, however, that such a reading of the statute implies too much, and that court allowed for an exception in certain limited circumstances. *Id.* at 978. While it is true that Congress included an actual innocence exception to the procedural bars on successive habeas petitions and evidentiary hearings but not to the one-year limitations period, that does not give rise to the negative implication that the absence of an exception was intended.

By analogy, we note that despite the fact that the statute fails to mention tolling, the majority of the courts of appeals which have addressed the issue, including this one, have held that the doctrine of equitable tolling applies to the one-year limitations period. *See, e.g., Dunlap*, 250 F.3d at 1007; *Harris v. Hutchinson*, 209 F.3d 325, 329-30 (4th Cir. 2000); *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999); *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998), *cert. denied*, 526 U.S. 1074 (1999); *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir.), *cert. denied*, 525 U.S. 891 (1998); *Calderon v. United States Dist. Court*, 128 F.3d 1283, 1289 (9th Cir. 1997), *cert. denied*, 523 U.S. 1061 (1998). In *Dunlap*, we held that the inclusion of the four sub-parts detailing the operation of the limitations period did not imply that Congress intended to preclude equitable tolling of the limitations period. *See also Harris*, 209 F.3d at 329 (holding that the "inclusion of [the four] statutory provisions does not give rise to the inference that the application of the limitation period must otherwise be absolute"). Moreover, though Congress included a thirty-day tolling period in a parallel limitations provision in AEDPA governing capital prisoners represented by competent counsel in state post-conviction proceedings, 28 U.S.C. § 2263(b)(3)(B),[13] the inclusion of a provision in that section does not imply that the absence of a similar one in § 2244(d)(1) was intentional. *Calderon*, 128 F.3d at 1289. The Ninth Circuit concluded that the inclusion of the tolling provision in § 2263(b)(3)(B) signaled Congress's intent to limit tolling to thirty days in that one specific circumstance, but not "to upset the normal default rule allowing longer tolling periods" for other habeas situations. *Id.*

---

[13]The tolling provision in § 2263(b)(3)(B) provides "[t]he time requirements established by subsection (a) shall be tolled . . . during an additional period not to exceed 30 days, if . . . a showing of good cause is made for the failure to file the habeas corpus application within the time period established by this section." 28 U.S.C. § 2263(b)(3)(B).

In interpreting a statute, we presume that Congress legislates against the background of existing jurisprudence unless it specifically negates that jurisprudence. *Young v. United States*, 535 U.S. 43, 49-50 (2002); *Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 590 (1995); *United States v. Shabani*, 513 U.S. 10, 13 (1994). Because at the time AEDPA was enacted there was a rebuttable presumption that equitable tolling applied to statutes of limitations and no indication that Congress intended otherwise, we concluded that the one-year limitations period in AEDPA was subject to equitable tolling. *Dunlap*, 250 F.3d at 1004. Similarly, in enacting AEDPA, Congress was working against the jurisprudential background of *Murray v. Carrier* and *Schlup v. Delo*, in which the Supreme Court held that a showing of actual innocence, defined as more likely than not that no reasonable juror would vote to convict, was sufficient to overcome a procedurally-defaulted habeas petition. Congress adopted a more stringent actual innocence exception in AEDPA's successive-petition and evidentiary-hearing provisions, requiring that the factual predicate of the claim could not have been discovered earlier and a showing "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. §§ 2244(b)(2)(B); 2254(e)(2). The fact that Congress adopted a narrower actual innocence exception in these two provisions is indicative, not of Congress's desire to exclude the exception with regards to the limitations period, but rather of its intent to limit the scope of the exception in those two specific areas. The more reasonable inference to be drawn from the absence of an exception in § 2244(d)(1) is that Congress intended not to alter the existing jurisprudential framework which allowed for a showing of actual innocence to overcome a procedural default.

Following the passage of AEDPA, the courts of appeals, including this one, have continued to apply the *Schlup* actual innocence exception to cases involving other types of procedural default, such as where the default is based on adequate and independent state-law grounds. *See, e.g.*, *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004); *Hubbard v. Pinchak*, 378 F.3d 333, 341 (3d Cir. 2004); *Jaramillo v. Stewart*, 340 F.3d 877, 883 (9th Cir. 2003). Of course, these procedural limitations existed prior to AEDPA, and therefore, Congress, which did not address them in the statute, did not alter the application of the *Schlup* actual innocence exception to them. By contrast, AEDPA's limitations provisions were an entirely new legislative creation, and thus, the determinative issue is whether Congress, in creating this new procedural limitation, intended for the existing jurisprudence governing habeas procedural limitations to apply. While the limitations provisions were new federal law, many states had already established statutes of limitations in post-conviction proceedings. Moreover, the Supreme Court had already held that where a habeas petitioner had defaulted on his federal claims in state court by failing to file timely in post-conviction proceedings, "federal habeas review of the claims is barred unless the prisoner can demonstrate . . . that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Thus, five years prior to the enactment of a federal statute of limitations, it was already well established that a procedural default resulting from an untimely filing could be excused by a federal habeas court "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496. Absent evidence of Congress's contrary intent, there is no articulable reason for treating habeas claims barred by the federal statute of limitations differently. Similar to our holding in the equitable tolling context, we conclude that against the backdrop of the existing jurisprudence and in the absence of evidence to the contrary, Congress enacted this new procedural limitation consistent with the *Schlup* actual innocence exception. Therefore, equitable tolling of the one-year limitations period based on a credible showing of actual innocence is appropriate.

Furthermore, the inclusion of an actual innocence exception to the limitations provisions is consistent with the underlying principles of AEDPA. As the conference report stated, one of the purposes of the act was "to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases." H.R. Conf. Rep. No. 104-518, at 111 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 945. Inclusion of an actual innocence exception to the limitations provisions does not foster abuse and delay, but rather recognizes that in extraordinary cases the societal interests of finality, comity, and conservation of scarce judicial resources "must yield to the imperative of correcting a fundamentally unjust incarceration." *Carrier*, 477 U.S. at 495 (internal citations omitted). As the Supreme Court has stated, "[t]he miscarriage of justice standard is altogether consistent . . . with AEDPA's

central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence." *Calderon v. Thompson*, 523 U.S. 538, 558 (1998). Any concerns that recognition of an actual innocence exception to the limitations period will result in a deluge of untimely frivolous constitutional claims is belied by this court's experience that a credible claim of actual innocence is extremely rare. *See supra* text accompanying note 4. Moreover, the existing availability of an actual innocence exception to other procedurally defaulted claims has not resulted in abuse and delay. It is only the extraordinary case, such as the present one, in which the habeas petitioner can present new evidence which undermines this court's confidence in the outcome of the trial and therefore requires assurance that it was free of non-harmless constitutional error.[14]

The State argues that recognition of an actual innocence exception would be inconsistent with § 2244(d)(1) because it would render the new evidence scenario of the limitation provision superfluous. Resp. Br. at 11. We find this argument to be wholly unpersuasive. The new evidence scenario states that the one-year limitations period begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." § 2244(d)(1)(D). The State argues that if this court recognizes an actual innocence exception, § 2244(d)(1)(D) would be rendered a nullity. Resp. Br. at 11. This argument fails to recognize the difference between timely claims brought under § 2244(d)(1)(D) and gateway actual innocence claims. A claim filed within one year of the discovery of new evidence proceeds directly to the district court for a determination of the merits of the habeas petitioner's constitutional claims. By contrast, under the *Schlup* actual innocence gateway, the petitioner must clear the procedural bar of demonstrating a credible claim of actual innocence before a court will reach the merits of his constitutional claims. Because one must meet a significantly greater burden to pass through the gateway, no petitioner would forego filing within the one-year period under § 2244(d)(1)(D) if possible. The actual innocence exception would be limited to the rare and extraordinary case where a petitioner can demonstrate a credible claim of actual innocence and the one-year limitations window has closed.[15] Therefore, an actual innocence exception would not be inconsistent with the AEDPA limitations provision itself.[16]

---

[14] Indeed, an actual innocence exception to the limitations provision is consistent with the narrower actual innocence exceptions included in AEDPA's successive-petition provision as well. Given the fact that the statute of limitations governs a petitioner's *first* habeas petition, a broader actual innocence exception in this instance would be more appropriate than the one in the successive petition stage, where recourse to the courts has already been had. *See Lonchar v. Thomas*, 517 U.S. 314, 324 (1996) ("Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.").

[15] An example of such a situation is this case, where Souter delayed filing his habeas petition until he received the last affidavit from Edward Gundy. If the Gundy affidavit had provided new evidence, the case would have proceeded directly to consideration of his underlying constitutional claims. We concluded, however, that the Gundy affidavit failed to provide any new evidence, and therefore, the petition was untimely. As a result, Souter is required to first demonstrate a credible claim of actual innocence before a habeas court may reach the merits of his constitutional claims.

[16] We decline to adopt the approach outlined by the Eighth Circuit in *Flanders*, which imposes a requirement that the petitioner show "action or inaction on the part of the respondent that prevented him from discovering the relevant facts in a timely fashion or . . . that a reasonably diligent petitioner could not have discovered these facts in time to file a petition within the period of limitations." 299 F.3d at 978. The requirement imposed by the Eighth Circuit has the effect of reducing actual innocence claims to only those which are timely under § 2244(d)(1)(D), the new evidence provision. That provision states the one-year limitations period begins to run from the date on which the new factual predicate "could have been discovered through the exercise of due diligence." § 2244(d)(1)(D). Presumably, if the respondent is preventing the discovery of evidence as required by *Flanders*, that evidence could not have been discovered through the exercise of due diligence, and therefore, the limitations period would not begin to run until it becomes available. The *Flanders* exception would not cover situations as in this case where the petitioner had collected sufficient evidence to demonstrate a credible claim of actual innocence but failed to file within the one-year limitations period.

Furthermore, given the grave constitutional concerns which are raised by the incarceration of one who is actually innocent, we decline to impose additional requirements upon a petitioner beyond those which the Supreme Court has set forth in its habeas corpus jurisprudence. As the Court itself has noted, "claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. Therefore, the underlying interests of AEDPA would not be furthered by imposing additional requirements upon a habeas

Finally, we conclude that constitutional concerns counsel in favor of upholding equitable tolling based on a credible claim of actual innocence. Several courts have recognized that denying federal habeas relief from one who is actually innocent would be constitutionally problematic.[17] *See Wyzykowski v. Dep't of Corr.*, 226 F.3d 1213, 1218 (11th Cir. 2000) (noting that barring a habeas petitioner who can demonstrate actual innocence "raises concerns because of the inherent injustice that results from the conviction of an innocent person, and the technological advances that can provide compelling evidence of a person's innocence" (footnotes omitted)); *Triestman v. United States*, 124 F.3d 361, 378-79 (2d Cir. 1997) (finding serious Eighth Amendment and due process concerns if AEDPA's procedural limitations barred a habeas petitioner claiming actual innocence from collateral review); *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir. 1997) ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent . . . we would be faced with a thorny constitutional issue."); *Miller*, 141 F.3d at 978 (noting that where a petitioner claims actual innocence, the limitations period "raises serious constitutional questions" which "possibly renders the habeas remedy inadequate and ineffective"); *Holloway*, 166 F. Supp. 2d at 1190 (holding that the use of AEDPA's one-year limitations period "to preclude a petitioner who can demonstrate that he or she is factually innocent of the crimes that he or she was convicted of would violate the Suspension Clause . . . as well as the Eighth Amendment's ban on cruel and unusual punishment"). "Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected . . . in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" *Schlup*, 513 U.S. at 325 (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). In light of these grave constitutional concerns, we believe equitable tolling of the statute of limitations based on a credible showing of actual innocence is appropriate.

In sum, we hold that where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims.

### III. CONCLUSION

Based on the foregoing, we conclude that though Souter's habeas petition is time-barred, he has demonstrated a credible claim of actual innocence, such that he is entitled to equitable tolling and may proceed to argue the merits of his ineffective assistance of counsel and due process claims. The district court's dismissal of his habeas petition is hereby **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

---

petitioner, while the resulting constitutional harm could be significant.

[17]In fact, Justice Blackmun, joined by Justices Stevens and Souter, suggested that it "may violate the Eighth Amendment to imprison someone who is actually innocent," and therefore, recourse to the judicial system would be required. *Herrera*, 506 U.S. at 432 n.2 (Blackmun, J. dissenting).