NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0489n.06

No. 10-3997

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*May 10, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| DEWITT McDONALD, JR., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| WARDEN, LEBANON CORRECTIONAL | ) | |
| INSTITUTION, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| _____ | ) | |

BEFORE: GRIFFIN and KETHLEDGE, Circuit Judges; and THAPAR, District Judge.[*]

GRIFFIN, Circuit Judge.

Petitioner DeWitt McDonald, Jr. was convicted in an Ohio court of various crimes arising out of a drive-by shooting that resulted in the death of Vivian Johnson. Krista Harris's trial testimony implicated McDonald in the shooting. More than six years after McDonald's trial, Harris declared in an affidavit that she had been coerced by the prosecutor into providing false testimony regarding McDonald's whereabouts and conduct the night of the shooting. McDonald sought federal habeas relief based on the affidavit, but the district court concluded that the new claims were time-barred and that he had not made a credible showing of actual innocence that would set aside the bar. We affirm.

_____

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

A.

The Ohio Court of Appeals summarized the underlying facts as follows:

On the evening of January 5, 1994, [McDonald] and companions Shawn Caston and Daryl Turner were drinking at Whitlee's Bar in Sandusky, Ohio. While at the bar, Caston became involved in an argument with Jerome Caffey. At the conclusion of this dispute, Caffey left Whitlee's and Caston rejoined [McDonald] and Turner. The next morning at approximately 3:00 a.m., Caffey was in the house he shared with Anna Hunt, his aunt. With Caffey was an acquaintance, Sharon McGill. Caffey's aunt also had guests. Tammy Johnson, her sister Vivian Johnson, and Laurie Henry were returning from a graduation party for Vivian's daughter when Tammy and Laurie decided to stop at Anna Hunt's. Tired, Vivian Johnson remained in the car while the other two went inside. As Tammy and Laurie prepared to leave the house, it was sprayed with multiple gun shots.

In the house, a bullet struck Sharon McGill. Another bullet shattered the window of the car in which Vivian Johnson was sitting and struck her in the neck. The bullet which struck Sharon McGill lodged in her abdomen, but she survived. Vivian Johnson died two days later as a result of her wound.

Police investigators searched the scene and found twelve spent nine millimeter shell casings of a type compatible with those used in an Intertech nine millimeter semiautomatic weapon. In an initial interview with police, a neighbor across the street stated that he had heard, but not seen, the shooting. He described hearing a four cylinder car with a loud muffler.

Police attention quickly focused on [McDonald], Caston and Turner. Witnesses described the dispute between Caston and Caffey at Whitlee's Bar. One witness at the bar reported over-hearing a conversation the trio had after the dispute occurred. The witness relayed that [McDonald] told Caston, with reference to Caffey, that "he wouldn't waste his time on one of them. He'd cap one of them." [McDonald], Caston and Turner were also seen together just a few minutes before the shooting in a car at a Shell station a short distance from Caffey's house.

On June 6, 1994, late in the afternoon, police first interviewed [McDonald]. [McDonald] denied making any statement to Caston to "cap" anyone. When asked of his whereabouts at the time of the shooting, [McDonald] said he had spent the

night with Daryl Turner at Turner's girlfriend's house. When Turner's girlfriend failed to substantiate this alibi, [McDonald] said he had lied to keep secret an [extra-marital] affair he was having with Krista Harris. According to [McDonald], he had spent the night with Harris in a motel.

Harris initially supported [McDonald's] story and went so far as to provide him with an alibi when she testified before a grand jury. Later though, Harris changed her testimony. During [McDonald's] trial, Harris stated that [McDonald] was supposed to meet her in a motel room a few blocks from the shooting scene, but he did not show up until sometime after 3:15 a.m. When he did arrive, according to Harris, he appeared nervous and shaken. Harris also testified that the next morning she overheard a telephone conversation between [McDonald] and Turner in which the shooting was discussed and [McDonald] stated that they "had to get the gun." [McDonald] left and returned with Turner a short time later; Turner was carrying a duffle bag.

[McDonald] and Turner then went to Columbus, Ohio, where they stayed for the next week. In her trial testimony, Harris reported receiving numerous telephone calls from [McDonald] during this period. [McDonald] advised Harris during the phone calls, "*** not to talk to police, [and] that I was going to be his alibi so he wouldn't go to jail ***." Over [McDonald's] objection, Harris also testified that during one of her telephone conversations with [McDonald] he gave the phone to Turner. Turner, according to Harris, warned her that she was too involved to talk to the police. He also told Harris that he had provided Shawn Caston with the gun, "*** [t]o take Jerome Caffey out," and that he and [McDonald] then, "*** got rid of it."

During the course of the investigation another witness changed his story. The neighbor from across the street who previously only reported hearing the shooting now admitted he had seen the shooting, but concealed the information from investigators out of fear of becoming involved. The neighbor told police and later testified that he had seen three black males in a compact car with a loud muffler shoot into the Caffey/Hunt house. He also noted that during the shooting he saw one of the occupants of the car pass the gun to a front seat passenger who shot it while holding it over the windshield.

The neighbor's observation of the gun being fired over the windshield became important because when investigators examined the car owned by Shawn Caston's girlfriend, a compact car without a muffler, they found another nine millimeter shell casing lodged in the well between the windshield wiper and the hood. Experts

determined that the firing markings on this shell matched those of the twelve casings found at the shooting scene.

In addition to this evidence, Daryl Turner admitted to police that he owned an Intertech nine millimeter pistol, but the weapon was never found.

[McDonald], Turner and Caston were indicted on charges arising out of the drive-by shooting. [McDonald] was indicted on seven counts: aggravated murder, murder, and involuntary manslaughter (all relating to the death of Vivian Johnson), unlawful discharge of a firearm into an inhabited dwelling, felonious assault on Sharon McGill, and attempted aggravated murder and attempted felonious assault (both relating to Jerome Caffey). The charges also contained firearm specifications and injury specifications. [McDonald] plead[ed] not guilty and the matter proceeded to trial. The three men were tried separately.

At trial, the state presented evidence which included testimony concerning the altercation at Whitlee's and [McDonald's] comments relative to Caffey. The neighbor who witnessed the shooting and Krista Harris also testified. At the conclusion of the state's case in chief, the trial court overruled [McDonald's] motion for a judgment of acquittal. [McDonald] presented no defense. On deliberation, the jury found [McDonald] guilty on all counts except the involuntary manslaughter charge. The trial court entered judgment on the verdict and sentenced appellant to life imprisonment.

*State v. McDonald*, No. E-95-046, 1997 WL 51221, at *1-3 (Ohio Ct. App. Feb. 7, 1997).

The Ohio Court of Appeals affirmed McDonald's convictions, *id.* at *7, and the Ohio Supreme Court declined discretionary review, *State v. McDonald*, 679 N.E.2d 309 (Ohio 1997) (table). A federal district court denied habeas relief. We declined to issue a certificate of appealability.

On December 21, 2001, Krista Harris, a key witness for the prosecution, filed an affidavit in the Court of Common Pleas for Erie County, Ohio. The affidavit stated the following in relevant part:

4.      In 1994 Affiant at the age of twenty was coerced by threat of false criminal charges including accessory to murder by the Erie County Prosecutor Kevin Baxter into providing false testimony in the trials of State v. Darryl Turner and State v. Dewitt Mc Donald.

5.      In 1994, Affiant was coerced into a non-consensual sexual relationship with the Erie County Prosecutor Kevin Baxter by threat of false criminal charges including being an accessory to murder prior to the trials of paragraph four.

6.      In 1995, while under the threat of false criminal charges including perjury, Affiant while engaged in a coerced sexual relationship with the Erie County Prosecutor Kevin Baxter observed Kevin Baxter . . . engage in illegal drug use to wit: cocaine on two occasions at his personal residence . . . .

7.      After the trials of paragraph four and while being forced to engage[] in a non-consensual sexual relationship with the Erie County Prosecutor Kevin Baxter, Affiant was ordered to move to Cleveland Ohio by Erie County Prosecutor Kevin Baxter in order to conceal the relationship.

8.      In order to facilitate the move . . . , the Erie County Prosecutor Kevin Baxter provided a check to Krista Harris drawn on the Erie County Prosecutor's Furtherance of Justice Fund in order to pay for a U Haul truck.

9.      In order to facilitate the move . . . , the Erie County Prosecutor Kevin Baxter provided a check to Krista Harris made out to Janet Torres in the amount of $800.00 drawn on the account of the Erie County Prosecutor's Furtherance of Justice Fund.

The affidavit was attached to a motion to disqualify the special prosecutor appointed in Harris's criminal case. Harris had been indicted in March 2001 on theft charges, and additional charges were added in November 2001. Dean Holman, prosecutor for neighboring Medina County, had been specially appointed in January 2001 by the court to investigate, indict, and prosecute Harris

because Kevin Baxter, the target of Harris's allegations, had intended to use her as a witness at a retrial of Shawn Caston, which created a conflict should Baxter prosecute her for the theft.[1]

During her criminal proceedings, Harris was represented by at least four different attorneys, one of whom was Elsebeth Baumgartner. Shortly after entering an appearance, Baumgartner moved to disqualify the special prosecutor and to quash Harris's indictment. She claimed that Holman's special appointment was invalid, which rendered the indictment void *ab initio*. Baumgartner also claimed that Holman and Baxter were engaged in "case fixing and bringing false criminal charges due to Kevin Baxter's enormous interest in silencing Krista Harris because of her knowledge of his criminal wrong doing."[2] Harris's affidavit was intended to substantiate these allegations. Baumgartner stated in her own affidavit that she overheard Baxter and Holman discussing Harris's case and believed the two committed crimes in the course of the prosecution.

Holman moved, in turn, to disqualify Baumgartner on grounds that she was purporting to be a witness for Harris and because she had a personal interest in the representation, demonstrated by the content in her affidavit about alleged corruption of various state officials. He argued that, "based on her affidavits, it is clear Baumgartner is attempting to become counsel in this case to use it as a forum to make false accusations against public officials and advance her personal interests and

---

[1]Caston's first conviction was vacated on habeas review on the basis of ineffective assistance of counsel. *See Caston v. Mitchell*, 12 F. App'x 208 (6th Cir. 2001) (per curiam). He later pleaded guilty to voluntary manslaughter and served an additional eighteen months in prison.

[2]Baumgartner had a history of filing pleadings that alleged widespread corruption among various Ohio officials. She was eventually disbarred by the State of Ohio and the United States District Court for the Northern District of Ohio.

agenda. Her actions show that her personal interest and agenda have manifestly affected her professional judgment." The trial court granted Holman's motion and disqualified Baumgartner. It denied Harris's motion, but granted her leave to renew the motion at a later time if she wished.

In addition to filing Harris's affidavit in the trial court, Baumgartner put Harris in contact with the Ohio Bureau of Criminal Identification & Investigation ("BCI"). BCI Agents Rhonda Dendinger and Rex Russell interviewed Harris regarding her allegations. Harris told the agents that she did not know when exactly McDonald arrived at the motel the night of the shooting but expressed her personal belief that McDonald more than likely was present at the shooting. She further told them that she testified the way Baxter had told her to, but she could not recall whether her testimony was truthful because she could not remember what she testified to. She did recall, however, that Baxter told her to say that she overheard McDonald tell Turner on the phone the morning after the shooting that they had to get rid of the gun. Baxter also told Harris to say that Turner had brought a bag with him to the motel the next morning. Both of these were untrue.

In a letter to Denise Demitt, one of Harris's attorneys at the time, Agent Russell stated that he and Agent Dendinger had interviewed Harris for nearly three hours. Russell stated further that, due to the profound nature of the allegations and circumstances surrounding Harris's decision to come forward, a polygraph examination was necessary. Harris had told the agents that she wanted the matter fully investigated within weeks so that any criminal charges against Baxter could precede and potentially affect her own trial. Russell noted that Harris's aggravation that the agents would be unable to investigate and indict Baxter within that amount of time created a "cause for concern."

Despite multiple follow-up phone calls to Harris regarding the investigation, the agents did not hear from her after the interview.

The news media quickly caught wind of Harris's allegations. On January 9, 2002, just two weeks after Harris filed her affidavit, *The News-Messenger* (Fremont, Ohio) reported that Harris had alleged criminal wrongdoing on the part of Baxter and Holman. Most notably, on February 1, 2002, *The Columbus Dispatch* reported on Harris's allegations in an article regarding Baumgartner's accusations against numerous Ohio officials. The article stated that "Ben Espy, a Columbus lawyer, said he may ask for a new trial in a client's murder case based on Baumgartner's renewed accusations about the Erie County prosecutor," and that "Espy . . . said he thinks he might get a new trial for Dewitt McDonald 'if I verify some statements.'" Espy submitted an affidavit in these habeas proceedings stating that he did not begin officially representing McDonald in post-conviction efforts until August 1, 2002, and that before that time, he had only represented McDonald's father, DeWitt McDonald, Sr., in an attempt to obtain money paid to one of McDonald's earlier defense attorneys.

On May 1, 2003, McDonald, through counsel, filed in the Ohio Court of Common Pleas for Erie County a petition for post-conviction relief and a motion for leave to seek a new trial. The trial court found that both requests were untimely and denied them. The Ohio Court of Appeals affirmed, and the Ohio Supreme Court denied review. Three months later, McDonald moved again for a new trial in state court. The trial court found the motion untimely as well, and the Ohio Court of Appeals affirmed that decision.

B.

While McDonald's second motion for a new trial was pending, he moved successfully in this court for permission to file a second or successive habeas petition. *See In re McDonald*, 514 F.3d 539 (6th Cir. 2008). McDonald then filed his second petition in the district court and raised three claims: (1) knowing use of perjured testimony; (2) failure to disclose impeachment materials; and (3) denial of the right to present a witness in one's defense. Each claim was predicated on Harris's allegations regarding Baxter's conduct during McDonald's trial.

After permitting the parties to expand the record, a magistrate judge recommended that the petition was untimely, but that McDonald could set aside the time bar because he had made a credible showing of actual innocence. The magistrate further recommended granting the petition with respect to two of McDonald's claims. The warden objected, and the district judge conducted an evidentiary hearing to assess the reliability of Harris's affidavit and determine whether McDonald could make a showing of actual innocence to excuse the time bar. The district court heard testimony from Krista Harris, Kevin Baxter, Rhonda Dendinger, Roy Prewitt (a detective who investigated the Johnson murder), and Dean Holman. Of particular note, Harris testified that she could not recall any of her allegations against Baxter or what she testified to during McDonald's criminal proceedings. Counsel for McDonald and the warden made closing remarks.

After the evidentiary hearing, the district court issued an opinion and order rejecting the magistrate's recommendation and dismissing McDonald's petition as barred by the statute of limitations. It concluded that the petition was untimely and that McDonald had not established a

credible claim of actual innocence. It granted a certificate of appealability "on the issues of whether Petitioner's claim is barred by the statute of limitations and, if so, whether Petitioner has made a showing of actual innocence." McDonald timely appealed.

II.

The district court concluded that McDonald's claims were time-barred. Its legal conclusions are reviewed de novo and its factual findings for clear error. *Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir. 2002).

A.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year limitations period that begins on the latest of "(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1). Because McDonald's claims rely upon evidence discovered after his judgment became final, subparagraph D applies. He must show that he filed within one year of the time he could have discovered the affidavit through the exercise of due diligence. *See DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006) (noting the petitioner's burden to demonstrate diligence). "The proper task . . . is to determine when a duly diligent person in [McDonald's] circumstances would have discovered [Harris's affidavit]." *Id.* at 470 (quoting *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000)). McDonald gets a full year after that date (plus any periods excluded by statutory tolling) to file.

The district court found that McDonald knew or should have known about Harris's affidavit at the latest by February 1, 2002, the date the *Columbus Dispatch* reported Ben Espy as saying that he might seek a new trial for McDonald on the basis of the affidavit. It reasoned that it was "unlikely that Espy would announce publicly his intention to seek a new trial on [McDonald's] behalf but fail to tell [McDonald] the same." McDonald offered no alternative date on which to start the one-year period, nor did he recount the steps he took to discover Harris's affidavit, which was his burden to do if he wanted a later start date. Therefore, using the date of February 1, 2002, the district court concluded that the one-year limitations period expired on February 1, 2003, which was three months before McDonald filed any post-conviction applications in state court that could have conceivably tolled the one-year period under § 2244(d)(2).

Using February 1, 2002, as the start date for the limitations period was entirely reasonable, especially in the absence of any evidence or argument by McDonald that he could not have learned of the affidavit sooner through the exercise of due diligence. That a petitioner does not in fact learn sooner of the factual predicate of his new claim does not, *ipso facto*, establish that a diligent person in the petitioner's shoes also would not have done so sooner. *See Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002) (noting that a petitioner who merely asserts that he did not discover the facts underlying his claim until a certain time has not demonstrated due diligence).

McDonald now argues (for the first time) that he could not have known about Harris's affidavit until August 1, 2002, when Ben Espy began officially representing him. Yet, he has not explained why this is so, given the district court's reasoning. Specifically, how is it that the attorney

who represented McDonald's father in a matter related to McDonald's criminal case, and who later represented McDonald in post-conviction proceedings based upon the affidavit, knew about the affidavit sometime before February 1, 2002, and knew it might be enough to get McDonald some relief, but failed to mention it to McDonald or his father (who assuredly would have told McDonald) for five months? McDonald has no answer.

But regardless, even if a reasonably diligent person in McDonald's shoes would not have learned of the affidavit until August 1, 2002, it does not change matters. Using that date, the one-year period expired August 1, 2003. Although the period is tolled while "a properly filed application for State post-conviction or other collateral review" remains pending, 28 U.S.C. § 2244(d)(2), none of McDonald's state post-conviction petitions and motions were "properly filed" for purposes of statutory tolling because they were all denied as untimely.[3] *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) (holding that an untimely application for post-conviction relief in state court is not "properly filed" for purposes of statutory tolling). And we may not second guess the state court's application of its own law. *See Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) ("Federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state."); *e.g.*, *id.* ("Accordingly, this court will not reconsider the Ohio state courts' determination that Vroman's post-conviction petition was untimely . . . ."). As the Supreme Court

---

[3]The Ohio courts concluded that McDonald filed well outside the required period and could not excuse the untimeliness by showing that he was prevented from discovering the factual predicate for his claim and that, but for the constitutional violation, no reasonable factfinder would have found him guilty.

made clear in *Pace*, "[w]hen a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)." *Pace*, 544 U.S. at 414 (quoting *Carey v. Saffold*, 536 U.S. 214, 226 (2002)). And this is so, even if, as here, the determination of timeliness requires judicial consideration.[4] *Id.* at 414-15; *see also id.* at 420 (Stevens, J., dissenting) ("The Court's chosen rule means that a state application will not be deemed properly filed – no matter how long the state court has held the petition, how carefully it has reviewed the merits of the petition's claims, or how it has justified its decision – if the court ultimately determines that particular claims contained in the application fail to comply with the applicable state statute of limitations."); *cf. Williams v. Birkett*, 670 F.3d 729, 734 (6th Cir. 2012) ("Therefore, even though M.C.R. 6.502(G)(2) may require judicial scrutiny to determine whether an exception applies, that does not require this court to hold that a successive motion in Michigan may be considered 'properly filed.'"). Accordingly, even if the one-year period began to run on August 1, 2002, as McDonald contends, it expired on August 1, 2003, well before McDonald filed the instant petition.

Without equitable tolling or a credible showing of actual innocence, McDonald's second habeas petition is barred by the statute of limitations. We consider these possibilities next.

B.

AEDPA's one-year limitation period may be equitably tolled if a petitioner shows that: (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented a timely filing. *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010); *see Hall v. Warden,*

---

[4]*See* Ohio Rev. Code § 2953.23(A) and Ohio R. Crim. P. 33(B).

*Lebanon Corr. Inst.*, 662 F.3d 745, 749-50 (6th Cir. 2011) (noting that *Holland*'s two-part test supersedes our previously-used five-part test). The district court concluded that McDonald was not entitled to equitable tolling because he failed to make a showing with respect to any of the five factors we used before *Holland* to consider requests for equitable tolling. *See Dunlap v. United States*, 250 F.3d 1001, 1008-10 (6th Cir. 2001).

On appeal, McDonald argues that he can meet *Holland*'s two-part test for equitable tolling. With respect to the first part – due diligence in pursuing rights – we have already explained that McDonald has not shown diligence. To repeat, McDonald has not identified the steps he took to learn of Harris's affidavit. Nor does he explain why he did not learn about it until August 1, 2002, even though the lawyer he hired to seek post-conviction relief on his behalf stated five months before that time that he was mulling McDonald's options for relief. And to further repeat, it is *McDonald's* burden to demonstrate due diligence. *DiCenzi*, 452 F.3d at 471; *see also Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011) ("[T]he petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling."). He has not done so.

As for extraordinary circumstances that prevented a timely filing, McDonald offers us two: (1) incarceration; and (2) that the district court would not have believed him had he testified that he did not learn of the affidavit until August 1, 2002. The first asserted reason is not extraordinary – the vast majority of habeas petitioners are incarcerated. The second reason makes little sense – that the district court might have disbelieved McDonald had he testified that he learned of the affidavit only on August 1, 2002, does not speak to any circumstance that *stood in his way* of timely filing.

While a statement to this effect might have spoken to *when* the limitations period began to run, *see* § 2244(d)(1)(D), it is not relevant to whether the limitations period, once triggered, should be tolled in equity due to extraordinary circumstances. McDonald is not entitled to equitable tolling.

## C.

Next, McDonald argues that the district court erred in finding that he failed to establish a claim of actual innocence so as to excuse the untimeliness of his habeas petition. In *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005), we held that "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt [in light of new evidence], the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims." *Id.* at 602. Under this "actual innocence" exception to the statute of limitations,[5] a court must ask "whether new facts raise sufficient doubt about the petitioner's guilt to undermine confidence in the result of the trial." *Id.* at 590 (quotation marks and alterations omitted). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it

---

[5]Since *Souter*, we have described a claim of actual innocence as a species of "equitable tolling." However, equitable tolling has historically required a showing of due diligence, *see Pace*, 544 U.S. at 419 ("Under long-established principles, petitioner's lack of diligence precludes equity's operation."), and the Supreme Court recently held that equitable tolling in habeas cases is no different in this respect, *see Holland*, 130 S. Ct. at 2562. We also recently reaffirmed that a credible claim of actual innocence excuses the time bar even without a showing of due diligence. *See Perkins v. McQuiggin*, 670 F.3d 665, 672-76 (6th Cir. 2012). In light of these developments, we find it more appropriate to think of a claim of actual innocence as a way to set aside the time bar, or as an *exception* to the procedural barrier, rather than as a vehicle for *equitably tolling* the limitations period. *See id.* at 675 n.3.

be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). We consider *all* new evidence bearing on the question of actual innocence, without regard to whether it would be admitted at trial. *Schlup*, 513 U.S. at 327-28. Sufficient showings of actual innocence are rare and the exception reserved for extraordinary cases. *Souter*, 395 F.3d at 590.

The district court concluded that Harris's affidavit and interview with BCI agents did not constitute new, reliable evidence that raised sufficient doubt about McDonald's guilt and undermined confidence in the verdict. Looking past the content of Harris's allegations, the district court considered the context in which they were made to assess their reliability. It was right to do so. *See Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."); *see also House v. Bell*, 547 U.S. 518, 557 (2006) (Roberts, C.J., concurring in the judgment in part and dissenting in part) ("In short, the new evidence is not simply taken at face value; its reliability has to be tested."); *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) ("[T]his court views with great suspicion the recantation testimony of trial witnesses in postconviction proceedings."); *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) ("Legally, recanting affidavits are always viewed with 'extreme suspicion.'" (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991))).

We give deference to the district court's factual assessments regarding the reliability of new evidence presented at the evidentiary hearing. *See House*, 547 U.S. at 539. And that deference applies equally to credibility determinations. *Brooks*, 626 F.3d at 897. However, the district court's

ultimate determination regarding actual innocence, i.e., whether the new facts raise sufficient doubt about the petitioner's guilt to undermine confidence in the result of the trial, is a legal question we review de novo. *See House*, 547 U.S. at 539-40; *McSwain v. Davis*, 287 F. App'x 450, 459 (6th Cir. 2008).

The district court gave persuasive reasons for finding Harris's statements unreliable. It noted first that Harris had a personal motive for making her allegations against Baxter – she was under criminal charges for theft at the time and had filed the affidavit in support of her motion to disqualify the special prosecutor and quash her indictment. In addition, Agent Dendinger's testimony at the evidentiary hearing and Agent Russell's letter to Harris's counsel following Harris's interview with the two agents further indicate that Harris's purpose for submitting the affidavit was to substantiate her arguments for dismissal of her own then-pending indictment. Dendinger testified at the evidentiary hearing that Harris wanted to control the interview and was insistent that the investigation and indictment of Baxter be completed within a few weeks of the interview so that it could potentially affect her criminal proceedings. Russell's post-interview letter indicated that Harris's insistence on a tight time-frame was concerning. McDonald contends that Harris came forward shortly after the statute of limitations for perjury had expired,[6] and that the possibility of being prosecuted was the real reason she did not come forward sooner. While one could reasonably draw this inference, the district court implicitly rejected it, and we cannot say that its finding is

---

[6]Ohio's limitations period for perjury is six years. *See* Ohio Rev. Code § 2901.13(A)(1)(a); *State ex rel. Dominguez v. State*, 951 N.E.2d 77, 78 (Ohio 2011) (per curiam).

clearly erroneous. Moreover, the circumstantial evidence supporting the finding that Harris's own criminal prosecution motivated her to come forward is strong, and McDonald has not pointed to any direct evidence to the contrary.

The district court also considered that Harris had made her allegations shortly after coming into contact with Elsebeth Baumgartner and that Baumgartner had a lengthy history of making false and scandalous accusations against Ohio officials, thereby casting further doubt on the veracity of Harris's allegations. Denise Demitt, Harris's counsel before Baumgartner, testified in disciplinary proceedings concerning Baumgartner that, despite not being a criminal defense lawyer, Baumgartner "signed on to [Harris's] case because she saw a host. She saw a chance that she [could further] her agenda through . . . this woman [now] sitting in prison. It is a travesty." This all suggests that Baumgartner put Harris up to the whole thing and calls into doubt the affidavit's reliability.

Finally, the district court cited Harris's general lack of credibility as a reason why her affidavit was unreliable. The court noted that Harris had told three different stories regarding McDonald's whereabouts the night of the shooting: (1) she told the first grand jury that McDonald was with her at the time; (2) she told the second grand jury and the petit jury that McDonald showed up after the shooting and appeared nervous and shaken; and (3) she told Agents Russell and Dendinger that she did not know if McDonald was involved, but expressed her personal feeling that he was. Finally, at the evidentiary hearing, she was unable or unwilling to recall any details of her

earlier statements, or say whether the allegations in her affidavit were true.[7] Although McDonald

surmises that Baxter had threatened Harris into silence, the claim is unsubstantiated and belied by

the fact that Harris came forward in 2001, when she would have harbored the same fear of Baxter.

The district court recognized that some evidence in the record corroborates Harris's

allegations, but found that it was of little value in determining the reliability of Harris's allegations

regarding McDonald's trial. We agree. First of all, Harris claimed that Baxter used his office's

funds to move her from Sandusky to Cleveland to cover up their illicit relationship. Checks from

Baxter's office issued to pay for the move do exist, and Baxter does not dispute that he helped Harris

move. Baxter and Prewitt testified, however, that Harris was relocated because she feared retaliation

from McDonald's family, not to cover up an illicit relationship. It was the district court's prerogative

to credit Baxter's explanation; doing so was not clearly erroneous.

Additionally, Harris disclosed to the BCI agents various details regarding the inside of

Baxter's house, which supports her allegation that she visited his home on various occasions during

their relationship. Some of Harris's description was accurate and some was not, and she left out

some significant features. The court found that, even if Harris's account of the home were accurate,

she easily could have learned the details from someone familiar with the home, such as Baxter's

---

[7]Notably, however, Harris was able to recall the details surrounding her criminal case pending at the time she made the allegations. She testified that a prison psychiatrist had recently diagnosed her with post-traumatic stress disorder and suggested that the disorder had contributed to her lapse of memory. She was unable to explain why she could recall the details of her own criminal case but not those surrounding her allegations against Baxter made contemporaneously. The district judge asked for permission to obtain prison records regarding the diagnosis, but Harris declined.

estranged brother, Edward Baxter, who had spoken to Harris weeks prior to her BCI interview. Specifically, in a disciplinary hearing concerning Elsebeth Baumgartner, Edward Baxter testified that Harris called him after Baumgartner told Harris that he (Edward) was going through a similar situation with Kevin. Although Edward testified that Harris described to him the inside of Kevin's home, Edward's credibility is a serious question. He pled guilty in April 2003 to one charge of obstruction of justice in a case involving his brother and admitted under oath that he "facilitated the communication of false information regarding my brother, Kevin J. Baxter to other individuals." Furthermore, Edward had a motive to lie about his brother, having been embroiled in a bitter probate dispute regarding their parents' estate.

Apart from Harris's affidavit, McDonald offers further new evidence that he believes supports his innocence. He offered this evidence in the district court, but the district court concluded, without explanation, that the evidence was not new or reliable and did not cast doubt upon McDonald's guilt. Although such an explanation would have been helpful, we ultimately agree with the district court on the issue.

First, McDonald offers that Shawn Caston, one of the other defendants charged in the Johnson shooting, passed a polygraph examination in February 2002, in which he stated he (Caston) was the shooter and did not mention that McDonald was with him at the time. McDonald considers this strong evidence that he was not at the shooting. But it does not appear from the polygraph results that Caston ever said McDonald did not participate in the shooting or that Caston acted alone. Those questions, it appears, were never asked. Moreover, on March 19, 2002, after the polygraph

examination, Caston stated under oath that McDonald *was involved* in the shooting and fired the gun a couple of times at the house. Therefore, Caston's polygraph examination does not cast doubt upon McDonald's guilt.

Second, McDonald asserts that another person has confessed to killing Vivian Johnson. Specifically, Jermaine Johnson, Vivian's son, signed a sworn affidavit stating that Jerome Caffey told him, "I killed [your] momma." However, Caffey's statement to Johnson can hardly be considered a reliable confession to Johnson's killing. According to the affidavit, the statement was made during a heated altercation between Caffey and Jermaine at a bar and seems to have been intended entirely to goad Jermaine into fighting. Indeed, a state trial court found the statement unreliable for this reason when McDonald raised it as a basis for a new trial.

For all these reasons, McDonald has failed to demonstrate by a preponderance of the evidence, on the basis of new and reliable evidence, that no reasonable juror would have found him guilty beyond a reasonable doubt. He cannot excuse the untimeliness of his petition, and the district court properly dismissed it.

III.

Finally, McDonald argues that the district court erred by not letting various other individuals testify at the evidentiary hearing, and by denying his request to expand the record to include the results of a future investigation into a potential motive by Baxter to wrongfully prosecute McDonald. The district court did not certify this issue for appeal, and McDonald has not asked us to expand the certificate to include the issue. We do not consider issues not certified for appeal. *See Bugh v.*

*Mitchell*, 329 F.3d 496, 502 n.1 (6th Cir. 2003). Although we have the power to expand the certificate on our own, *see, e.g.*, *Humphreys v. United States*, 238 F. App'x 134, 138-39 (6th Cir. 2007); *Mack v. Holt*, 62 F. App'x 577, 578 (6th Cir. 2003) (per curiam), we decline to do so here because the district court's rulings on these procedural matters are not debatable. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see* 28 U.S.C. § 2253(c)(2).

IV.

For these reasons, we affirm the judgment of the district court.